CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED
August 19, 2026
LAURA A. AUSTIN, CLERK
BY: /s/L. Ayers
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 7:24-cr-00013 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| RAHYEEM TYQUAN BAKER | ) | Chief United States District Judge |

**MEMORANDUM OPINION**

Before the court is Rahyeem Tyquan Baker's motion for compassionate release, which he filed pro se. (Dkt. No. 69.) The court appointed the Federal Public Defender to represent Baker, and after seeking several extensions of time to respond, Baker's counsel filed an "Emergency Response" to the motion, which provided more information concerning his arguments and situation. (Dkt. No. 79.)

Baker seeks compassionate release to care for his young daughter, K.B. He was her primary caregiver before his incarceration, and then K.B.'s mother cared for her, but the mother was convicted of a federal crime and began serving her sentence in March 2026. Thereafter, K.B.'s maternal grandmother, Denise Abrams, took care of the child. Ms. Abrams is in poor and declining health, and even the government acknowledges (after Ms. Abrams's testimony before this court) that she likely is not capable of adequately caring for K.B. Baker thus seeks early release to care for his daughter.

The government filed a response in opposition, (Dkt. No. 84), and the court held an evidentiary hearing (over three separate dates), and heard oral argument from counsel. (Dkt. Nos. 85, 89, 92.) Baker also has filed several letters pro se (Dkt. Nos. 87, 94), which the court has considered. The United States contends that there are other adults related to the child or who know the child who could temporarily care for her until Baker is released. But the court

concludes that Baker has shown both that the child's current caregiver is unable to adequately care for K.B. on her own, and that there is no one willing and available to care for the child. For that reason, explained in more detail below, the court finds that extraordinary and compelling circumstances exist to grant Baker compassionate release. The court further finds that the 18 U.S.C. § 3553(a) factors support a slight reduction in his sentence, particularly since Baker's sentence is nearing its completion.

Thus, the court will grant Baker's motion and reduce his sentence of imprisonment to time served, as of the date fourteen days after entry of this opinion and order. In conjunction with that reduced sentence of imprisonment, however, the court also intends to impose, as a new special condition of his supervised release term, that Baker serve 180 days on home detention with electronic monitoring. The court intends to hold a hearing to impose that additional condition, unless both parties waive the hearing. *See United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020) (requiring sentencing courts to orally pronounce discretionary conditions of supervised release). If the parties agree to waive, they shall file a written waiver with the court within seven days after entry of this order, and there will be no hearing. If one or both parties decline to waive, then the court intends to impose that additional condition at a hearing on a date to be determined, but not later than fourteen days after entry of this order.

## I. BACKGROUND

### A. Baker's Criminal Proceedings

On October 2, 2024, Baker pled guilty to one count of a two-count superseding indictment, which charged him with possessing a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). (Dkt. No. 31.) At sentencing in April 2025, the court calculated his advisory guideline range as 70 to 87 months. In calculating the guideline range,

the court applied a 4-level enhancement—over Baker's objection—for a separate but connected felony offense with a firearm, which was based on video evidence that the court found showed him possessing a different firearm.

Baker sought a sentence of home incarceration, and the United States recommended a 57-month term of imprisonment. The court ultimately imposed a 29-month sentence. The court imposed that sentence after concluding that a 40-month sentence was appropriate and that Baker should receive an 11-month reduction in sentence for his discharged sentence on a related state charge, a reduction to which the government did not object.

Even the 40-month sentence was a downward variance from the guideline range, and the court varied downward primarily because of Baker's extraordinary efforts at rehabilitation between his 2022 offense and before sentencing. After serving eleven months in a state facility, he was released on September 6, 2023. He had no arrests or other known misconduct between then and his arrest for this offense in March 2024. He was released on pretrial supervision in April 2024, serving approximately thirteen months on home detention. During that time, he was living with his girlfriend, Valencia Burch, who has no criminal history and a history of steady employment.

Ms. Burch encouraged Baker to finally get much-needed mental health treatment, which he did. During that time, he took care of his children, maintained gainful employment, attended school, obtained his Commercial Driver's License, and had no problems on pretrial supervision. At sentencing, the court commended him for his sincere efforts to take his life in a better and lawful direction and for his great progress and rehabilitation.

Baker has now served well over half of his sentence. According to the Bureau of Prisons (BOP) website, Baker's current release date is July 2, 2027, less than one year away. In a recent

letter to the court, he stated that he believes he will be released to a "halfway house" on January 3, 2027. His counsel made the same representation. That date is about four months later than the release date being ordered by the court.

Baker's conduct in prison has been almost entirely positive. He has completed his GED, and he has completed significant programming offered at McDowell FCI. (Dkt. No. 79-2.) He had hoped to participate in the BOP's residential drug treatment program (RDAP), but he could not be accepted because he would not be able to complete it before his anticipated release date. (Dkt. No. 79-4.) He did have one disciplinary conviction while incarcerated, which the court addresses *infra* at Section II-D.

**B. Evidence Concerning Baker's Daughter, K.B., and Her Current Caregiver**

Baker has five children, two of whom are no longer minors. The youngest is a daughter, K.B., whose mother is Shaquan Webb. K.B. was three at the time of Baker's sentencing, and she is now five years old. Baker was K.B.'s primary legal custodian before his sentencing, and she lived with him and Ms. Burch for the thirteen months when he was on home detention. She then lived with her mother, Ms. Webb. Since Ms. Webb began serving her 60-month federal sentence in March 2026, K.B. has resided with her maternal grandmother, Denise Abrams. Both Ms. Webb and Ms. Abrams, however, have stated that they would like K.B. to live with and be cared for by Baker while Ms. Webb is incarcerated. (Webb Aff., Dkt. No. 79-5.)

Ms. Abrams is sixty years old and is not in good health. She suffers from degenerative disc disease, poor circulation in her legs, scoliosis, and has significant balance problems. She cannot drive and has frequent falls, including a fall that occurred two weeks before her July 30, 2026 testimony. She also has anxiety and went to the emergency room for an anxiety attack in June 2026. She receives SSI or SSDI from social security because she is disabled, she requires

considerable assistance herself, and she was recently assigned a home healthcare assistant by Medicaid. That assistant (who is also her son's fiancé), is with her from 7 a.m. to 3:30 p.m. every day and helps her shower, get dressed, and make meals. According to information in a screening form entered as an exhibit, she also helps Ms. Abrams take medication, and she provides supervision for a number of other activities of daily living.

Ms. Abrams testified credibly that she cannot properly care for K.B. on her own, given her worsening health. She explained that it is hard to get K.B. in and out of the tub, dressed, and ready for school activities To care for K.B., Ms. Abrams has to rely on others, including her son and three teenage grandchildren, all of whom live with her.[1] When Ms. Abrams has to go to medical appointments, she usually takes K.B. with her. A family friend drives K.B. to school and home.

**C. Other Potential Caregivers Identified by United States**

The United States points to other potential caregivers, including:

- Ms. Abrams's son, who lives with her, and his fiancé, who is Ms. Abrams's healthcare assistant;
- Baker's mother and brother, who live together; and
- Ms. Burch, Baker's girlfriend.[2]

The court discusses briefly those other individuals. The court learned very little about Ms. Abrams's son and his fiancé, except that they live with Ms. Abrams. In a subsequent letter to the court, Baker states that the son just recently completed a prison sentence after being

[1] One of the grandchildren is eighteen and leaving for college this fall.

[2] In its closing argument to the court, the United States also referred to an unnamed relative in Greensboro, but that person was raised by the government for the first time in its argument at the final portion of the hearing, and neither party had the opportunity ahead of time to address that person with evidence. The court is unclear as to who this individual is and, in any event, does not consider whether this individual is available. It is satisfied that Baker has met his burden of showing that the individuals initially identified by the government as potential caregivers are unavailable to provide care.

convicted for bank robbery. He states that he has been gone most of K.B.'s life, that K.B. does not know him, and that even if she knew him, Baker "wouldn't feel ok with another man I barely know keeping" her. The court certainly did not receive evidence suggesting that Ms. Abrams's son is willing or able to care for K.B.

As for Ms. Baker (K.B.'s other grandmother) and Baker's brother, both of those individuals testified. Ms. Baker testified that she works Monday through Thursdays from 8 am until 8 or 9 p.m. and then sometimes works overtime, arriving home at 11 p.m. Every other week, she works from home. She also makes crafts and sells them, attends church gatherings, and gets up before work to walk. She admitted that there were no physical conditions keeping her from caring for a child. But she stated that she does not have the time to take care of a young child, and she did not want to do so.

While Ms. Baker is K.B.'s grandmother, Baker insists that not only is his mother unwilling to take K.B., but that K.B. does not know her because she only had his daughter once before his incarceration and Baker had to "rush back" to get K.B. because she did not know her grandmother and was not comfortable with her. This is also consistent with Ms. Abrams's testimony, who says that Ms. Baker only came and picked up K.B. about "once in a blue moon."

Baker's brother knew that Baker had a 5-year-old child, but he did not know her name. He lives in his mother's basement, and they share expenses. He has three of his own children, but only one (a 2-year-old) lives with him sometimes, mostly on the weekends. He works full-time from 6 a.m. until 3:30 p.m. or 4:30 p.m. Monday through Friday and sometimes works on Saturdays. He testified that he cannot get off work for a doctor appointment. And he insisted that he cannot help with K.B. "timewise and financially."

Valencia Burch, Baker's girlfriend, was present at the third portion of the hearing,

apparently in support of Baker. She also was called to testify. She told the court that she is willing to allow Baker and K.B. to live with her in her apartment upon his release. But she emphasized that she is unable and unwilling to raise his child on her own and without him present. She further explained that she has a demanding job that requires her to be on call and requires her to travel once a month. She also cares for her own fifteen-year-old daughter, who lives with her, and Ms. Burch transports her daughter to school every day outside the district where they live.

## II. DISCUSSION

### A. Overview

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to reduce a defendant's sentence under certain circumstances. As amended by the First Step Act and in pertinent part,[3] the statute

> authorizes a court, in its discretion, to reduce a term of imprisonment after it has (1) considered the [18 U.S.C.] § 3553(a) factors for imposing a sentence, (2) found that "extraordinary and compelling reasons warrant such a reduction," and (3) found that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

*United States v. Crawley*, 140 F.4th 165, 169 (4th Cir. 2025) (quoting 18 U.S.C. § 3582(c)(1)(A)); *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024). In 2023, the Commission issued an amended policy statement setting forth a non-exhaustive list of circumstances that may individually or in combination constitute "extraordinary and compelling" reasons for a sentence reduction. *See* U.S.S.G. § 1B1.13. That policy statement governs Baker's motion. *See Crawley*, 140 F.4th at 170.

---

[3] Prior to the First Step Act of 2018, only the BOP could seek relief in court under the statute. The First Step Act changed the statute to allow a federal inmate to file a motion for compassionate release directly with the court after exhausting his administrative remedies.

The defendant bears the burden of showing that extraordinary and compelling reasons exist. *See United States v. Hargrove,* 30 F.4th 189, 195 (4th Cir. 2022) (noting that the inmate provided information "to carry his burden of demonstrating that his medical conditions served as an extraordinary and compelling reason for release"). Only after a movant establishes his eligibility for relief by showing "extraordinary and compelling" reasons may the court consider the whether it should grant that relief based on consideration of the § 3553(a) factors. *Rutherford v. United States*, 608 U.S. ___, 146 S. Ct. 1320, 1333 (2026).[4] And "[a] movant for compassionate release bears the burden of showing why the § 3553(a) factors justify a modified sentence." *Centeno-Morales*, 90 F.4th at 279.

**B. Exhaustion**

Section 3582(c) also requires administrative exhaustion before a defendant may file a motion requesting relief under it, although that requirement is a "'non-jurisdictional claim-processing rule' that can be waived or forfeited if not timely raised." *United States v. Davis*, 99 F.4th 647, 653 n.2 (4th Cir. 2024) (quoting *United States v. Muhammad*, 16 F.4th 126, 130 (4th Cir. 2021)). To exhaust, a defendant must request that the BOP bring a motion on his behalf and then either "fully appeal" the BOP's failure to do so or allow 30 days to lapse without a response. § 3582(c)(1)(A).

Baker asserts that he has properly exhausted his administrative remedies and provides proof of that exhaustion. (Dkt. No. 79-1.) The United States does not contest that Baker has

[4] The court has considered the impact of the *Rutherford* decision, in which the Supreme Court cabined the discretion of district courts to determine what constitutes an extraordinary and compelling reason for release. *United States v. Conley*, No. 3:11CR65, 2026 WL 1837672, at *4 (E.D. Va. June 25, 2026) (describing *Rutherford* in detail). *Rutherford* emphasized that "the heartland of compassionate release" is "defined by a prisoner's personal circumstances," such as family considerations. 146 S. Ct. at 1331. The Court was critical of reasons outside of those personal circumstances being found to be "extraordinary and compelling." *Rutherford* does not alter the availability of compassionate release on the basis sought here, which are clearly personal circumstances, and it certainly does not preclude granting relief on this basis. Nor has the United States argued that it does.

properly exhausted. (Opp'n 4 n.2, Dkt. No. 84.) Accordingly, the court finds that Baker has satisfied the statute's exhaustion requirements.

**C. Extraordinary and Compelling Reasons**

The court considers next whether Baker has shown an extraordinary and compelling reason for a reduction in his term of imprisonment. The Guidelines recognize a limited number of family circumstances that may constitute "extraordinary and compelling" reasons, one of which is "[t]he death or incapacitation of the caregiver of the defendant's minor child." U.S.S.G. § 1B1.13(b)(3)(A).

It is undisputed that K.B.'s primary caregiver, until the time he went to prison, was Baker. After that, Ms. Webb (K.B.'s mother) was K.B.'s primary caregiver until she began serving her 60-month federal sentence in March 2026. Thereafter, Ms. Webb's mother, Denise Abrams, assumed custody over K.B. and is now the K.B.'s caregiver. The court finds that Ms. Abrams, because of her own disabilities and health issues, which themselves require full-time assistance and care with activities of daily living, is effectively "incapacitated" and unable to continue caring for K.B.

That does not end the court's inquiry, however. Two other provisions, dealing with the incapacitation of the defendant's spouse or parent, qualify as "extraordinary and compelling" circumstance "when the defendant would be the only available caregiver." U.S.S.G. § 1B1.13(b)(3)(B)–(C). The guideline does not contain similar language for the provision dealing with a defendant's minor child. *See* U.S.S.G. § 1B1.13(b)(3)(A). The Fourth Circuit has at least noted the difference, and in one case remanded for consideration of "whether Taylor is required to demonstrate that he is the only available caregiver for his minor children, *compare* U.S.S.G. § 1B1.13 cmt. n.1(c)(i) *with* U.S.S.G. § 1B1.13 cmt. n.1(c)(ii), as well as whether

sufficient evidence in the record demonstrates that alternative caregivers would be capable of caring for his children." *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020). *Cf. United States v. Centeno-Morales*, 90 F.4th 274, 280 (4th Cir. 2024) (noting that the death of the primary caregiver for an inmate's minor child is an "extraordinary and compelling reason" and not mentioning any requirement that the defendant be the only available caregiver, but then noting the possible lack of available caregivers in the context of the § 3553(a) factors). The Fourth Circuit has never addressed the issue directly, as far as the court can tell.

Many lower courts have addressed the issue, and there certainly seem to be differing opinions. Some courts that have squarely held the defendant need not demonstrate that he is the only available caregiver, typically relying on the different language in the minor child provision. *United States v. Taylor*, No. CR ELH-20-0392, 2025 WL 1518845, at *12 (D. Md. May 27, 2025) ("The plain language of the Guidelines does not require a defendant to demonstrate that there are no other available caregivers for a minor child. . . . I cannot import a requirement that the Sentencing Commission failed to include."). The Maryland *Taylor* court also collected authority from three other district courts flatly holding that the requirement does not apply under (b)(3)(A), as it simply is not included in that language of that subsection. *Id.* (collecting authority). *See also United States v. Parham*, Crim. No. ELH-13-151, 2024 WL 4753375, at *10–11 (D. Md. Nov. 12, 2024) ("[I]t is clear that the provision does not require defendant to be the sole possible caregiver."); *United States v. Taylor*, No. 3:15-00009, 2020 WL 6532844, at *1 (S.D.W. Va. Nov. 3, 2020) ("[A]s the Court of Appeals suggested, the Court subsequently held that Mr. Taylor is not required to show that he is the *only* available caregiver to obtain relief.") (emphasis added), *aff'd*, 846 F. App'x 221 (4th Cir. 2021).

However, as another judge of this court recognized, at least as of 2023, courts "generally

den[ied] compassionate release when another suitable caregiver is available for a defendant's child." *United States v. James*, No. 7:19-cr-00024, 2023 WL 6164018, at *3 (W.D. Va. Sept. 21, 2023). *See also United States v. Sanchez*, No. 2:20CR00010, 2024 WL 1653769 (W.D. Va. Apr. 16, 2024) (denying a compassionate release claim under § 1B1.13(b)(3)(A) when records submitted by the incarcerated individual indicated that there may be relative caregivers available to take custody of child); *United States v. Barlow*, No. 7:19-CR-00024-4, 2023 WL 2755598, at *3–4 (W.D. Va. Mar. 31, 2023) (denying compassionate release in a case where the child lived with her paternal aunt while both parents were incarcerated and emphasizing that the aunt's age (sixty years old), work outside the home, and exhaustion caring for the child are not allegations of incapacitation).

And even among those courts that seem to conclude a defendant must show no other available caretakers, some have granted release despite the existence of another possible caregiver other than the incarcerated individual. *See, e.g.*, *James*, 2023 WL 6164018, at *4 (granting relief where the children's caregiving grandmother, who was 76 years old, suffered from severe illness rendering her effectively incapacitated and incapable of caring for the children, and defendant feared "losing [the children] to the foster care system," and noting that because the children's aunt travels frequently for her job, she cannot assume care of the children); *United States v. Henriquez*, No. 1:15-cr-225-1, 2021 WL 5771543, at *3–5 (M.D.N.C. Dec. 6, 2021) (granting compassionate release despite the existence of an alternative caregiver where the court found defendant's familial circumstances extraordinary when considered with his model behavior in prison, deep efforts at successful rehabilitation, work ethic, support of Bureau of Prison employees, and length of sentence served).

Ultimately, the court is more persuaded by the reasoning of courts that have held there is

no *requirement* that a defendant show he is the only available caregiver when a minor child's caregiver dies or is incapacitated. The plain language of the guideline provision, and the differences in the subsections, certainly supports that conclusion. *See Taylor* (the Maryland case), 2025 WL 1518845, at *12.

But even if Baker were required to show he is the only available caregiver, the court concludes that he has narrowly met that burden. On this issue, again, courts are not united as to whether a potential caregiver can be considered "available" where the person has expressed an unwillingness to provide that care, but the court believes he or she might have the ability to do so.

The United States relies on authority on one side of that case divide to argue that "inconvenience, or even the imposition of significant life changes for other potential caregivers, 'doesn't mean they are unavailable, or that their inconvenience should weigh more heavily than society's interest in seeing that [the defendant] serves out his agreed-upon sentence.'" (Gov't Opp'n 8 (quoting *United States v. Bartlett*, No. 1:14-CR-14-HAB, 2025 WL 1272136, at *3 (N.D. Ind. May 1, 2025)).) And it points to cases where courts have said that loved ones must often make necessary and inconvenient life adjustments during an individual's incarceration, but that alone does not create "extraordinary" circumstances. *Id.* (citing *United States v. Michel*, 2025 WL 786284, at *4 (S.D. Fla. Mar. 12, 2025), and *United States v. Wilson*, 2024 WL 2160837, at *2 (W.D.N.C. May 14, 2024)).

But there is also authority suggesting that "theoretical[]" availability is "not pertinent," such as where a caregiver is unwilling to help because their own work and family responsibilities significantly limit their ability to provide care. *United States v. Hunter*, 2025 WL 1370800, at *6 (N.D. Ill. May 12, 2025). The court sees merit to both positions. Ultimately, though—and

regardless of which broad view is favored—a court must evaluate the availability of other possible caregivers based on the specific facts before it, which is what this court does.

The facts here on the availability of other caregivers are somewhat difficult to weigh. Certainly, none of the potential caregivers identified by the United States has expressed a willingness to care for K.B., and indeed, all those who testified indicated that they could not and/or would not care for her. The court recognizes that all of these other potential caregivers have an incentive to say that they cannot take care of K.B., in that it might help Baker get a reduced sentence. And the court cannot say for sure that, if K.B. were removed from Ms. Abrams's care or about to enter foster care, none of these other persons would volunteer to care for her. But the court found them credible when testifying that they are unwilling to offer full-time care and/or that they perceive themselves unable to do so because of their own work and family commitments. It appears, moreover, that K.B. does not have a close relationship with any of her other relatives, including Baker's mother and brother, who did not even know the child's name when he testified.

As for Ms. Burch, she seems to have had more regular contact with K.B. and perhaps a closer relationship with K.B. Indeed, she helped Baker to care for K.B. when Baker was on home confinement before sentencing and K.B. lived in her home. But she explains that she has a demanding job that requires her to be on-call and requires her to travel once a month. She also cares for her own fifteen-year-old daughter, who lives with her. The court cannot determine that Ms. Burch is an available potential caregiver, especially given her lack of familial relationship and her firm testimony that she could not and would not care for K.B. alone.

The United States insists that the familial caregivers (such as Ms. Abrams's son and Ms. Baker and her son) are available, even if it would not be "convenient" for them to care for K.B.

and even if they are unwilling to do so. And the court recognizes that many families of incarcerated individuals make sacrifices to keep custody of children within the extended family. The court further recognizes that many people, even if the only adult in a household, care for their own children, grandchildren, or a relative's children while working demanding, full-time jobs. All of that said, taking on the full-time care of a young child like K.B. is not a small or insignificant commitment. And here, we have a defendant who is nearing the end of his sentence, and was not only involved in the child's care, but the primary caregiver for the child before his incarceration. Moreover, none of the other proposed relatives appear to have much of a relationship, let alone a close one, with K.B. This is not a case where an incarcerated parent with little experience caring for the child is attempting to use the child's existence to seek early release.

In these unusual circumstances and considering the specific proposed available caregivers, the court concludes that Baker is eligible for a sentence reduction because his minor child's primary caregiver is physically incapacitated from taking care of the child, and there is no other able and willing caregiver for her.

**D. § 3553(a) Sentencing Factors**

Having found that an extraordinary and compelling reason exists for a sentence reduction, the court "must 'consider[]' the § 3553(a) sentencing factors 'to the extent that they are applicable' in deciding whether to exercise its discretion to reduce the defendant's term of imprisonment." *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (quoting 18 U.S.C. § 3582(c)(1)(A)).

Those factors include:

- the nature and circumstances of the offense;
- the history and characteristics of the defendant;

- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to deter criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational, vocational and other correctional treatment services;
- the kinds of sentences available and the sentencing range for the offense; and
- the need to avoid unwarranted sentence disparities.

18 U.S.C. § 3553(a).

The nature and circumstances of Baker's offense are not favorable. He was convicted of being a felon-in-possession, which while dangerous, is not necessarily violent. But the court is concerned with the conduct that led the court to apply the four-level enhancement. Although Baker denied that conduct, the court found, by a preponderance of the evidence, that Baker had fired a gun toward an occupied building. That conduct is extremely dangerous, violent, and troubling, and it has caused the court to carefully evaluate the potential risk to the public and the need to adequately punish and deter such behavior. But the court ultimately concludes that the other sentencing factors, on balance, support a reduction in sentence, especially because the court will impose a home detention condition lasting 180 days.

In so concluding, the court again gives great weight to Baker's rehabilitation, which appears to have continued while incarcerated, for the most part. He did receive one disciplinary conviction for fighting with another inmate in November 2025, but he apparently admitted that conduct to the BOP.[5] (*See* Dkt. No. 84-2.)

As for Baker's history and characteristics, they are mixed. The court agrees with the United States that his criminal history before his offense is not favorable. And although the

[5] Baker did not testify, so the court has no sworn testimony before the court on the circumstances of that incident. Defense counsel represented that, in response to bullying by another inmate, Baker reported the conduct, and the BOP arranged a transfer to keep them apart. Before the transfer could occur, however, the bully assaulted Baker, who acted only to defend himself.

court believed that history was overstated, he nonetheless was a category V. Again, though, he has exhibited an unusually strong case of rehabilitation, and the court believes that he is a much-reformed person from the man who committed both his earlier crimes and his offense here. While Congress has dictated that rehabilitation, standing alone, "shall not be considered an extraordinary and compelling reason" for a sentence modification, 28 U.S.C. § 994(t), the Fourth Circuit has explained that rehabilitation efforts must be considered as part of the court's determination of whether a sentence reduction is warranted. *United States v. Martin*, 916 F.3d 389, 397–98 (4th Cir. 2019).

Moreover, the court considers again that he had an early exposure to alcohol and illegal drugs and had significant mental health issues that went untreated for a long time. He also was shot in three different incidents, in the head, the legs, and his arms, resulting in significant and ongoing physical injuries and limitations.

The United States also suggests that the need to avoid unwarranted sentencing disparities counsels against any reduction. (Opp'n 11.) But the court concludes that his personal circumstances and his extraordinary rehabilitation, especially when coupled with the need to provide care for his daughter, make his an unusual case. Thus, any disparity is not unwarranted.

The court also believes Baker is sincere in wanting to care for his daughter, and he demonstrated that sincerity through his actions in providing steady care for her (and his other children) prior to his incarceration on this offense.

On balance, and considering all the § 3553(a) factors, the court concludes that a reduced sentence, resulting in allowing Baker to be released approximately four months before he likely would be released to a halfway house, is sufficient, but not greater than necessary to satisfy the purposes of sentencing. That is particularly true because the court intends to impose, as new

conditions of his supervised release, both that he live with K.B. and serve as her caregiver and that he serve the first 180 days on home detention with electronic monitoring. Thus, the public will be protected, the seriousness of the offenses will be emphasized, and Baker will continue to be punished in the imposition of that additional condition, which is a significant deprivation of liberty, even more significant that just serving a term of supervision. *See Gall v. United States*, 552 U.S. 38, 44–48 (2007) (noting that supervisees "do not enjoy the absolute liberty to which every citizen is entitled" and that supervision is a "substantial restriction of freedom")

In sum, after consideration of the § 3553(a) factors, the court finds that reducing Baker's sentence to time served, effective fourteen days after entry of this order, is appropriate.

III. CONCLUSION

For the above reasons, Baker's motion for a reduced sentence under § 3582(c)(1)(A) (Dkt. No. 69) will be granted. The court will reduce his sentence as stated in the accompanying order, and he will be sentenced to time served, effective fourteen days from the date of this order. The court also will alter the conditions of his supervised release and impose the new conditions at a hearing to be held within fourteen days unless both parties waive it within writing in 7 days. An appropriate order will be entered.

The clerk is directed to provide copies of this memorandum opinion and the accompanying order to all counsel of record, the United States Marshals Service, the United States Probation Office, and to the Federal Bureau of Prisons.

Entered: August 19, 2026.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
Chief United States District Judge